**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| ELIZABETH DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:15-cv-02226-JHE |
| | ) | |
| STATE FARM FIRE AND CASUALTY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION[1]**

Plaintiff Elizabeth Davis ("Davis") initiated this action against Defendant State Farm Fire and Casualty Company ("State Farm") alleging state law claims for breach of contract and bad faith. (Doc. 1). Davis contends State Farm failed to adequately investigate her claim after her house burned and acted in bad faith when it failed to pay her claim in accordance with the terms of the policy. (*See id.*). State Farm has moved for summary judgment. (Doc. 24). The motion is fully briefed and ripe for review. (*See* docs. 26-29). For the reasons stated below, State Farm's motion for summary judgment will be **GRANTED**.

**I. Standard of Review**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 9).

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

Until January 2013, Davis, together with her husband, Ed Davis, lived in the home located

at 220 Thomas Road, Hayden, Alabama. (Doc. 24-2 at 4, 6 (12:8-13, 18:17-19:1)). Until at least November 29, 2013, the Davises insured this house through a homeowners' policy provided by State Farm. (Doc. 24-5).

In January 2013, the couple separated, and Davis moved in with her mother in Hoover, Alabama. (Doc. 24-2 at 6 (19:4-20:1)). At that point, the Davises' son, Wesley, moved into the house in Hayden due to concerns about vandalism. (*Id.* at 6-7 (20:19-21:3)). Wesley lived in the house in the months leading up to, and on the date of, the fire.[2] (Doc. 24-7 at 4 (11:1-20)). Davis characterized her financial situation in the months leading up to the fire as "bad." (Doc. 24-2 at 14-15 (52:23-53:3)). Davis was a legal secretary earning $38,000.00, annually. (*Id.* at 12-13 (43:10-18, 46:4-9)). Mr. Davis was not contributing financially, so Davis was paying for all of the bills herself, but could not manage all of the expenses. (*Id.* at 15 (53:4-12)). She was about three months behind on her mortgage at the end of 2013. (*Id.* (54:1-6)). Davis had a new car note and was paying the bills on the house. (*Id.* (54:14-21, 56:20-21)). Davis's checking account had a negative ending balance on her November 2013 statement. (*Id.* at 18 (68:11-20); doc. 24-3 at 1). The account had four overdraft fees in November 2013, and on December 12, 2013, the ending balance was $34.90. (Doc. 24-2 at 19 (69:4-11); doc. 24-3 at 1-5).

In September 2013, Davis bought a new car and asked State Farm to change her mailing address to her mother's house in Hoover. (Doc. 24-2 at 32-33 (124:16-125:2)). When State Farm received the information about the address change, it sent a cancellation notification for the homeowners' policy on November 5, 2013, to the insured because the house was no longer owner-

---

[2] Mr. Davis moved out of the subject home and into an apartment in October 2013. (Doc. 24-2 at 6-7 (20:19-20, 21:1)). Davis testified it was her intention to move back into the house after Mr. Davis moved out, (*id.* at 7, 34 (21:12-17, 132:3-5)), but she was still living at her mother's house after Mr. Davis moved out in October 2013, (*id.* at 6 (19:19-20:5)).

occupied.  (Doc. 24-8 at 12, 14 (43:14-44:9, 51:4-52:19)).  After receiving the notice, on November 5, 2013, Davis called Agent Kim Lee's office.  (Doc. 24-2 at 31 (118:15-119:2); doc. 24-3 at 20).  Regarding the call, Davis testified as follows:

> She said well, we thought you weren't living there anymore.  I said that's not correct, my property is there.  I stay with my mom there during the week when I'm working.  I didn't get into it with her that I had separated from my husband.  And I said well, add it back in.  But changing that address and all, that's not correct.

(Doc. 24-2 at 31 (118:23-119:8).[3]    State Farm then reinstated the policy on November 7, 2013.  (Doc. 24-9 at 13 (46:16-21)).  State Farm contends the November 2013 notice regarding whether the home was owner-occupied was *entirely separate* from the cancellation it contends Davis later instructed on November 29, 2013.  (Doc. 24-8 at 12 (43:14-44:9); doc. 24-10 at 14 (50:2-12)).

Davis's State Farm premiums were set up to automatically draft from her checking account at the end of November 2013, and she was concerned about an overdraft.  (Doc. 24-2 at 29, 55 (110:18-111:4, 112:16-20, 213:10-17)).  If the State Farm premium drafted, Davis knew it would bounce, leading to a snowball effect where other charges to her bank account would also bounce.  (*Id.* at 34 (132:9-23)).

---

[3] Later, Davis participated in the following exchange:

Q: [A]fter you left in January 2013, you may have gone to the house two or three more times –
A: Uh-huh.
Q: -- after that?
A: I don't know how many times, but I did go back to the house.
. . .
Q: [W]hen I was asking you about living in Hoover, you said it was normal for me to stay with her, Gladys, during the week and at the subject home on the weekends.  Were you going back to Hayden like every weekend or was it just a few times?
A: Just a few.  I did not go back up there every weekend.

(Doc. 24-2 at 54 (211:18-212:15)).

On November 29, 2013, Davis called State Farm Agent Kim Lee's office, but because no one was there,[4] she was routed to the State Farm Customer Response Center ("CRC"). (Doc. 24-2 at 29 (110:10-18); doc. 24-9 at 9 (31:8-17)). According to her deposition testimony, Davis reported to the CRC representative she did not have enough money to pay the premium and requested the automatic draft stop. (Doc. 24-2 at 29, 35 (110:17-19, 133:11-19)).

Following the conversation, the CRC representative, Matthew Castillo entered two "remarks" or notes relating to Davis's homeowners' policy. First, Castillo typed a note at 8:16 AM CST stating "Insured is requesting to cancel policy, no reason given from insured. Effective as of 11/29/2013." (Doc. 24-9 at 12 (41:10-13); doc. 24-9 at 23). Another note, dated November 29, 2013, entered by Castillo one minute later at 8:17 AM CST, states "Customer declined making payment using another payment method. The Recurring Monthly will be reinstated automatically when payment is received. To prevent a cancellation notice being sent on the account, the payment is due by 11-28-2013." (Doc. 24-11 at 20). The CRC representative's note was transferred to Agent Kim Lee's office, and when that office reopened the following Monday, her staff person, Jamie Stewart, reviewed the note from the CRC representative. (Doc. 24-11 at 8 (26:1-9)). That day, December 2, 2013, Davis spoke with Stewart on the phone. (Doc. 24-2 at 31 (117:19-118:4); doc. 24-11 at 8 (27:19-21)). Following the call, Stewart entered a note stating "she canceled the house and only paid on the cars and life insurance today. Changed Status from: Incomplete to: Complete." (Doc. 24-11 at 20). However, this note was connected to Castillo's note regarding suspension of recurring monthly payment. (*Id.*). In connection with Castillo's note regarding a request for cancellation, Stewart wrote "I made a change today to have this done. Changed Status

---

[4] November 29, 2013, was the Friday after Thanksgiving.

from Incomplete to: Complete." (Doc. 24-9 at 23). Another note stated "CANCEL POLICY PER CALL FROM ELIZABETH." (Doc. 24-11 at 19). Stewart testified that she would have obtained information from Davis as to the date Davis wanted the cancellation to become effective and that it is "always [her] practice to verify [the effective date] with the customer." (Doc. 24-11 at 9 (29:9-21)). She further testified that she doesn't note that she asks the customer to verify the effective date because "The request notes itself," meaning that "When we put in the request for the cancellation, it will not allow us to submit anything without an effective date." (*Id.* (30:13-20)). Stewart testified she manually entered the cancellation effective date as November 29, 2013, in the cancellation request for Davis's homeowners' policy. (*Id.* (31:12-22)). Once Stewart entered a cancellation request, it was transmitted to underwriting. (Doc. 24-10 at 22 (83:13-16, 84:23-25), 35). Underwriting received the request on December 3, 2013. (*Id.* at 23 (86:9-11), 35). Underwriting understood the cancellation request to mean that the insured requested policy cancellation with an effective date of November 29, 2013. (*Id.* at 23 (86:8-16), 35).

No payment was made on the homeowners' policy between November 29, 2013 and December 13, 2013. (Doc. 24-2 at 44 (169:8-170:8)). Because Davis had stopped the automatic draft on November 29, 2013, she provided a credit card number to Stewart to pay for the auto and life insurance policies in the amount of $169.25. (*Id.* at 36, 41 (137:3-10, 158:16-23); doc. 24-11 at 8 (28:12-16)). In a recorded statement taken during the investigation, the following exchange occurred regarding the November 29, 2013 phone call:

> Q: [Jordan Justice] Okay Ms. Davis um can you please uh tell me uh from my understanding is you called their main office on November 29th and requested the cancellation of your policy can you please explain uh what took place then?
> A: [Davis] Well I I knew that I had gotten a thing in the mail I knew that they were fixing to automatically deduct $ 478.70 and I knew that I did not have that amount in my checking account right then and I didn't want it to get over drafted.
>
> Q: Uh so it was w- um when did you call the office r- uh and request that they

cancel it?
A: Uh it was on n- November the 29th.

. . .

Q: Okay okay all right now the the 29th request you said you called and requested it because I understand there was the draft was fixing to come out of your account and you didn't have it in there and that's when you called in and request that the policy be canceled?
A: yeah

(Doc. 24-3 at 16-17).  Later, at her disposition, Davis testified that she instructed the representative not to draft the money from her account, but did not recall other instructions or the language she used during the November 29th phone call.  (Doc. 24-2 at 55 (213:14-214-8)).  When asked if either of his parents told him what was going on with the insurance after the fire, Davis's son testified that he thought Davis told him State farm had paid off the mortgage, but she did not know what was going to happen with the contents of the house.  (Doc. 24-7 at 13-14 (48:21-495)).  When asked why, Davis's son answered that he thought his mother told him "she had called and said cancel it, but then Dad had called and said do not cancel it, what I remember."  (*Id.* at 14 (49:7-10)).

At several times during her deposition Davis was asked what she asked State Farm to do when she called on November 29, 2013.  During one of these exchanges, Davis testified as follows:

Well, I had gotten a notice from them – notice a notice from them.  I had talked to the girl previously in Kim Lee's office and she had told me that my insurance was good until December 10th.  And when I called this guy and talked with – it was a male that I talked with on the 29th and told him that I did not have the money in the bank for him to draft the premium right then.  It was my thinking and intention and understanding that if I didn't make a payment before the 10th that nothing was going to happen because they had told me I was good until December the 10th, that I was covered until December 10th.

(Doc. 24-2 at 30 (114:9-115:2)).[5]  At other times during the deposition, when asked about the November 29, 2013 phone call, Davis testified as follows:

> I don't recall that I said the words he used.  I wasn't there when that statement was transcribed.  I called him, called State Farm, told him not to take the money out.

(Doc. 24-2 at 43 (165:16-20)).

> Well, it would have been around the 28th, 29th would be the reason I called them then to say they are fixing to draft it, I don't have enough.
>
> Q: Were your instructions to -- well, was the point of your call to say don't draft it, don't take the money out.
>
> A: Don't draft it.
>
> Q: And you don't recall any other instructions you would have given to them at the time?
>
> A: Not specifically.
> Q: So if the person at State Farm you talked to says you asked to cancel the policy, you don't –
>
> A: I would say I don't recall what language I used in that phone call.

(*Id.* a t 55 (213:14-214:7)).

After hearing about Davis's inability to pay the homeowner's policy premium,[6] on December 4, 2013, Mr. Davis deposited $400.00 in their joint checking account so Davis could pay for the insurance.  (Doc. 24-2 at 35 (134:10-136:3); doc. 24-3 at 1).  Even after receiving the funds from Mr. Davis, Davis did not attempt to pay the premium on the homeowners' policy until *after* the fire loss (which occurred on December 7, 2013).  (Doc. 24-2 at 42 (162:4-164:21)).

---

[5] Notably, as discussed *infra*, Davis did not attempt to pay the homeowner's premium until December 13th.  (Doc. 24-4 at 2).

[6] At her deposition, Davis testified she called Mr. Davis and said she had called the insurance company because she didn't have enough money to pay the premium.  (Doc. 24-2 at 35 (134:11-14)).

On December 9, 2013, when the State Farm Payment Plan did not receive funds due, State Farm sent an automatic notice to Davis. (Doc. 24-3 at 22, doc. 24-4 at 1, doc. 24-8 at 17 (61:21-62:3)). The notice included the homeowners' premium, but also included the life and auto insurance premiums. (Doc. 24-3 at 22, doc. 24-4 at 1). Although State Farm contends it considered the homeowners' policy cancellation was effective on November 29, 2013, State Farm Payment Plan had not learned of the cancellation at the time it sent the automatic notice. (Doc. 24-10 at 15 (54:4-11). State Farm Payment Plan was notified of the alleged November 29, 2013 cancellation after underwriting finished processing the request on December 17, 2013. (*Id.* (55:22-56:2). On December 13, 2013, a week after the December 7, 2013 loss, Davis wrote a check to State Farm for the policy premium. (Doc. 24-4 at 2). Bank records indicate that on December 12, 2013, there was only $34.90 in the Davises' joint account. (Doc. 24-3 at 1).

On December 17, 2013, State Farm sent a confirmation to Davis that her insurance was cancelled, effective November 29, 2013. (Doc. 24-3 at 21). Ten business days elapsed between underwriting's receipt of the cancellation request (December 3, 2013) and State Farm's confirmation of cancellation (December 17, 2013). (Doc. 24-10 at 10 (35:8-10, 15-17)).

During the interim, on December 7, 2013, there was a fire at the 220 Thomas Road house in Hayden, Alabama. (Doc. 24-2 at 8 (25:1-9)). The cause of the fire remains unknown. (*Id.*). Wesley Davis, Davis's son, was at the home during the fire. (Doc. 24-7 at 11 (15-22)). Wesley Davis informed Mr. Davis about the fire, and Mr. Davis informed Davis. (Doc. 24-2 at 7 (24:8-23)). Mr. Davis notified State Farm of the fire on December 7, 2013. (*Id.*at 28 (106:14-107:2)).

Claim Specialist Jordan Justice investigated the claim, recommending denial to his Team Manager, Eddie Travelstead, who approved the denial of the claim. (Doc. 24-8 at 20, 36 (75:1-16; 139:7-18)). Justice and Travelstead worked together throughout the investigation. (Doc. 24-

12 at 4-5 (11:11-12:6, 16:9-19)). Justice received the assignment on December 7, 2013, and began

his investigation by speaking with the State Farm agent on December 9, 2013. (Doc. 24-8 at 23

(85:13-86:13)). Justice testified:

> Yeah, on December 9th I Spoke to the State Farm agent that morning and the
> insured had canceled their policy on November 29th, 2013, and this was keyed into
> the system and a refund for the premium not used will be sent to the insured. Talked
> about the date of loss was on December 7th, 2013, after the cancellation request
> took place. Agent was going to email me documentation showing the cancellation
> request by the insured was completed, you know, then I was going to move forward
> with my investigation.

(*Id.* (86:2-13)). After this conversation, Justice contacted underwriting and confirmed the effective

date of the purported cancellation. (*Id.* (88:6-8)). As to cancellation, the policy provided as

follows:

> 5. **Cancellation.**
>
>   a.  You may cancel this policy at any time by notifying [State Farm] in writing
>       of the date cancellation is to take effect. We may waive the requirement
>       that the notice be in writing by confirming the date and time of cancellation
>       to you in writing.

(Doc. 24-6 at 31). Travelstead testified it was his understanding that when making a cancellation

request, the insured selects the effective date, and State Farm goes with what the insured requests.

(Doc. 24-12 at 5 (13:20-14:1)). He further explained that "the effective cancellation date would

be the date that the policy is no longer in force. It is canceled that day." (*Id.*). When asked about

the provision of the policy waiving the requirement that the insured's request be in writing by State

Farm confirming the date and time of cancellation in writing, Travelstead testified that, to his

knowledge, based on the policy language, there was no timeframe. (*Id.* (14:11-15:4)).

On December 16, 2013, Justice requested a copy of the confirmation of cancellation sent

to Davis. (Doc. 24-8 at 24 (92:13-16)). Justice also spoke with a State Farm Payment Plan

representative about the December 9, 2013 notice sent to Davis. (*Id.* at 25 (94:2-10)).

Furthermore, he took recorded statements from both Davis and her agent's staff person, Jamie Stewart. (*Id.* (95:7-11); doc. 24-11 at 10-11 (36:19-37:7), 34-36).

On January 28, 2014, State Farm sent a letter to the Davises explaining that State Farm had concluded its investigation, finding that there was no active policy in force on the date of the loss. (Doc. 24-8). State Farm paid off the Davises' mortgage because the mortgage company had no way of knowing that the policy had been purportedly canceled.[7] (Doc. 24-12 at 16 (57:5-58:17)). During the Summer of 2014, Justice received a letter from a lawyer representing Davis, raising additional issues as to the cancellation, which led State Farm to conduct an additional investigation into the claim. (Doc. 24-8 at 25 (96:8-12)). At that time, Justice also took Mr. Davis's recorded statement.[8] (*Id.* (96:2-12)). After conducting the additional investigation, State Farm again determined that no policy was in force on the date of the loss and notified Davis that its decision to deny coverage stood. (Doc. 24-2 at 46 (179:7-20); doc. 24-4 at 4).

Prior to the fire loss, State Farm had made the decision to "Non-Renew" the Davises' policy, which would be applied to the next renewal term, July 2014. (Doc. 28-4 at 17 (67:15-22)). This information was contained in the underwriting file. (Doc. 28-5 at 21 (81:23-82:10)). Although Davis's counsel contends Justice would have known about the non-renewal decision,

---

[7] Regarding State Farm's decision to pay the Davis's mortgage after the fire, Davis contends that Travelstead testified that State Farm satisfied the mortgage under Paragraph 10, Mortgage Clause, Letter C, which states "[i]f this policy is canceled by us, the mortgagee shall be notified at least 10 days before the cancellation takes effect." (Doc. 26 at 13-14 (citing doc. 24-12 at 16 (57:2-12, 59:3-8)). Travelstead corrected this testimony in his deposition, explaining that because the mortgagee was unaware of the purported cancellation request and would not have had a chance to protect its interest before cancellation became effective, State Farm decided to protect the mortgagee's interest. (*Id.* at 16-17 (57:14-19, 62:13-21)). State Farm's Rule 30(b)(6) witness on claims-related questions testified to the same. (Doc. 28-5 at 9 (35:1-5)).

[8] Since that time, but before Davis filed her complaint, Mr. Davis passed away. (Doc. 24-2 at 4 (12:16-20)). The divorce, that had been filed on January 15, 2014, was dismissed. (*Id.* at 8-9 (26:21, 27:1, 28:14-16, 31:1-2)).

(doc. 26 at 13), counsel cites no evidence to support this assertion, and it appears Davis's counsel never questioned Justice about the non-renewal decision, (*see* doc. 24-8).

In an email sent on December 16, 2013, between members of State Farm's underwriting department, Mitch Moore, apparently referring to Davis's claim, states: "Since they both appear out, can you handle today?  Claims is a little nervous about this one . . . ."  (Doc. 27-3 at 38). Davis sought no other information about the meaning of this email.  Justice testified that "I don't know why that person put that.  I mean, we wasn't [sic] nervous or anything in regards to this.  I don't know why they would put that in an email."  (Doc. 24-8 at 3 (8:3-6)).

### III. Analysis

#### A. Breach of Contract

A "policy" has been defined as a "(a) written contract of . . . insurance." Ala. Code §27-14-1(1) (1975).  In Alabama, an insurance contract is essentially like all other contracts and is governed by general rules of contract law.  *Pate v. Rollinson Logging Equip., Inc.*, 628 So. 2d 337 (Ala. 1993).  A "breach of contract" occurs when there is a failure by one of the parties to the contract to perform any promise that forms the whole or part of the contract without a legal excuse for doing so.  *Dickinson v. Cosmos Broadcasting Co., Inc.*, 782 So. 2d 260 (Ala. 2000).  To prevail on a breach of contract claim, Davis must prove (1) the existence of a valid contract binding the parties, (2) her own performance under the contract, (3) State Farm's non-performance, and (4) damages. *See Jones v. Alfa Mut. Ins. Co.*, 875 So. 2d 1189, 1195 (Ala. 2003).  Specifically, State Farm contends Davis cannot establish there was a valid contract of insurance on the date of loss (December 7, 2013), because Davis cancelled her policy, effective November 29, 2013, and therefore the court should grant summary judgment as to the breach of contract claim.  (Doc. 24 at 15).

### 1. Did Davis Request Cancellation of the Policy Effective November 29, 2013?

When cancellation is a defense in a breach of contract action, the insurer has the burden of proving the policy was cancelled. *Mid-State Homes, Inc. v. Cherokee Ins. Co.*, 284 So. 2d 274, 275 (Ala. 1973). "[I]n the absence of a restrictive statutory provision, the parties to an insurance contract may specify the method by which it may be canceled and the parties are thereby bound. . . . [A]n insurance policy may be canceled according to its terms." *Id.* at 276. State Farm points to the cancellation provision of Davis's homeowners' policy, which allows an insured to cancel the policy at any time *in writing*, or for State Farm to waive the writing requirement by "confirming the date and time of cancellation to [the insured] in writing[,]" (doc. 24-6 at 31), and argues Davis exercised her right under the policy to cancel the policy at any time by verbal request, and State Farm confirmed her request in writing (albeit after the loss, on December 18, 2013), resulting in no policy being in force on the date of loss, (doc. 24 at 15). Davis argues there is a genuine issue of material fact as to whether Davis canceled the homeowners' policy and that the cancellation provision of the policy is ambiguous. (Doc. 26 at 15-21).

The potential question of fact here is: What did Davis say during the November 29, 2013 phone call with CRC Representative Castillo; more specifically, did Davis request State Farm cancel her homeowners' insurance policy during that phone call? The repeated contention in Davis's response brief is that she did <u>not</u> request cancellation of her homeowners' policy; however, this assertion is not supported by the evidence counsel cites. *See Dudley v. Gandy*, No. 7:11-cv-4170-LSC, 2014 WL 5020102, at *5 (N.D. Ala. Oct. 7, 2014) ("Counsels' unsupported statements in a memorandum are not evidence for purposes of summary judgment"). Specifically, the deposition excerpts cited do not support the assertion that Davis did not request cancellation of her homeowners' policy. (Doc. 26 at 4, 15; *see* doc. 24-2 (132:1-5, 133:18-19, 165:19-20; and 213:5

to 214:7)).  Davis's actual testimony, and whether it creates a question of fact, will be discussed below.

The evidence Davis requested cancellation of her homeowners' policy during the November 29, 2013 phone call is as follows: (1) two notes or "remarks" Castillo entered on November 29, 2013, memorizing the phone call; (2) three notes or "remarks" Stewart entered after her phone call with Davis on December 2, 2013; and (3) the transcript of Davis's recorded statement taken by Justice during the investigation.  Castillo's notes from November 29, 2013, state "Insured is requesting to cancel policy, no reason was given from insured.  Effective as of 11/29/13[,]" which was entered at 08:16:20AM CST, and "Customer declined making a payment using another payment method.  The Recurring Monthly will be reinstated automatically when payment is received.  To prevent a cancellation notice being sent on the account, the payment is due by 11-28-2013[,]" which was entered at 08:17:26 AM CST.[9]  (Doc. 24-9 at 23; doc. 24-11 at 20).  Stewart's notes from her December 2, 2013 call with Davis state: "CANCEL POLICY PER CALL FROM ELIZABETH[,]" which was entered at 12:06:38 PM CST, and "she canceled the house and only paid on the cars and life insurance today," which was entered at 4:50:41 PM CST with the description "Suspended Recurring Monthly Payment," and "I made a change today to have this done Changed States from: Incomplete to: Complete, which was entered at 4:52:59 PM

_____

[9] Davis argues the court should look at Castillo's second note as supporting her contention that she did not intend to cancel her policy, but merely requesting the automatic payments be stopped.  (Doc. 26 at 15-16).  This is illogical.  One minute before this note, Castillo entered a remark stating "Insured is requesting to cancel policy, no reason given from insured."  (Doc. 24-9 at 23).  Furthermore, the second note regarding "Suspended Recurring Monthly Payment" states that "[t]o prevent a cancellation notice being sent on the account, the payment is due by 11-28-2013."  (Doc. 24-11 at 20).  The note was entered on November 29, 2013, the same day as the phone call.  (*Id.*).  Thus, the deadline to submit payment to prevent a cancellation notice from being sent out had passed; i.e., with the cancellation of the recurring monthly payment, a cancellation notice would issue.

CST with the description "Request for Cancellation." (Doc. 24-11 at 19-20; doc. 24-9 at 23).

Excerpts from Davis's recorded statement taken after the fire and during the investigation, include:

> Q: [Jordan Justice] Okay Ms. Davis um can you please uh tell me uh form my understanding is you called their main office on November 29th and requested the cancellation of your policy can you please explain uh what took place then?
> A: [Davis] Well I I knew that I had gotten a thing in the mail I knew that they were fixing to automatically deduct $478.70 and I knew that I did not have that amount in my checking account right then and I didn't want it to get over drafted.
>
> Q: Uh so it was w- um when did you call the office r- uh and request that they cancel it?
> A: Uh it was on n- November the 29th.
>
> . . .
>
> Q: Okay okay all right now the the 29th request you said you called and requested it because I understand there was the draft was fixing to come out of your account and you didn't have it in there and that's when you called in and request that the policy be canceled?
> A: yeah

(Doc. 24-3 at 16-17).

The evidence Davis points to in support of the assertion that she did <u>not</u> request to cancel her homeowners' policy during the November 29, 2013 call is thin at best. Davis never testified that she did not request cancellation of her policy. Instead, Davis testified she could not remember the specific instructions she gave on November 29, 2013, other than not to draft the premium out of her account. (Doc. 24-2 at 55 (213:14-214:7)). Davis's testimony that is the most advantageous to her position is that she believed she had coverage until December 10, 2013, and that it would not have not been logical for her to cancel her policy, but only to request State Farm not draft the premium from her account. (Doc. 24-2 at 30 (114:9-115:2)). Specifically, Davis states "[i]t was my thinking and intention and understanding that if I didn't make a payment before the 10th that nothing was going to happen because they had told me I was good until December the 10th, that I was covered until December 10th." (*Id.*). And, "I don't think that I would have said cancel on

15

that date, because why would I have canceled it on the 29th if I knew I had good insurance until the 10th." (*Id.* (116:11-15)).

Taking Davis's testimony as true, that she did not intend to cancel her homeowner's policy when she called State Farm on November 29, 2013, there is still the undisputed evidence of Davis's December 2, 2017 phone call with Stewart, and Stewart's testimony that Davis confirmed the policy cancellation and cancellation date of November 29, 2013. (Doc. 24-11 at 9 (29:9-21, 31:2-33:4)). Furthermore, during her deposition, Davis does not dispute the records or recollection of State Farm representatives. Specifically, after responding that she did not recall any other instructions she would have given during the November 29, 2013 call, Davis was asked "So if the person at State farm you talked to says you asked to cancel the policy, you don't – " and Davis answered "I would say I don't recall what language I used in that phone call." (Doc. 24-2 at 55 (214:3-7)).

Additionally, on December 2, 2013, Davis paid the life and auto insurance premiums, but not the homeowners' policy premium. (Doc. 24-11 at 20). And, although Mr. Davis deposited $400.00 in their joint account on December 4, 2013, after he learned Davis did not pay the homeowners' policy premium, (doc. 24-2 at 35 (134:10-136:3); doc. 24-3 at 1), Davis did not attempt to pay on the policy until December 13, 2013, almost a week after the fire loss. (Doc. 24-2 at 42 (162:4-164:21)).

Although it may not have been Davis's intention to cancel the homeowners' insurance policy when she called State Farm on November 29, 2013, it is undisputed that at some point during either the November 29, 2013 and/or December 2, 2013 call, Davis requested or at least agreed to cancellation of her policy, effective November 29, 2013. To create a factual issue sufficient to defeat summary judgment, Davis asks the court to infer that this undisputed evidence

*misstates* what she said, during the call and further asks the court to ignore the fact she offers no evidence to dispute State Farm's evidence. While the court must draw all reasonable inferences in favor of Davis, this inference is not reasonable.

### 2. Is the Cancellation Provision Ambiguous?

Davis contends State Farm's cancellation policy permitting the insured to cancel his or her policy is ambiguous. (Doc. 26 at 17-21). The issue of whether a contract is ambiguous is a question of law for the court to decide. *McDonald v. U.S. Die Casting & Dev. Co.*, 585 So. 2d 853, 855 (Ala. 1991) ("If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court. . . . "). The terms of an insurance policy are ambiguous only if the policy's provisions are reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to their meaning. *United Services Auto. Ass'n v. Smith*, 329 So. 2d 562 (Ala. Civ. App. 1976). In determining whether ambiguity exists, a court should apply the common interpretation of the language alleged to be ambiguous. *See Ala. Farm Bureau Mut. Cas. Co. v. Goodman*, 188 So. 2d 268, 270 (Ala. 1966). This means the terms of the insurance policy should be given a rational and practical construction. *Green v. Merrill*, 308 So. 2d 702 (Ala. 1975). A court cannot consider the language in the policy in isolation, but must consider the policy as a whole. *Turner v. United States Fidelity & Guar. Co.*, 440 So. 2d 1026 (Ala. 1983).

The policy, in relevant part, provides as follows:

5. **Cancellation.**

    a. You may cancel this policy at any time by notifying [State Farm] in writing of the date cancellation is to take effect. We may waive the requirement that the notice be in writing by confirming the date and time of cancellation to you in writing.

(Doc. 24-6 at 31).  Given its content and context in the policy, it is clear this provision is referring to methods by which an insured can initiate cancellation.  It begins with "You may cancel . . ." and the next paragraph provides methods of cancellation State Farm can initiate.  Also, the language of the policy itself unambiguously allows an insured to request cancellation by providing the date on which it is to take effect, and State Farm then confirms that in writing.  Specifically, the first sentence sets forth one method of cancellation, by the insured's writing informing State Farm of the date cancellation should take effect.  The second sentence provides a second method of cancellation by referring back to the first method, removing one requirement, and adding another.  In "waiv[ing] the requirement that the notice be in writing," the provision modifies the first method of cancellation as follows: "You may cancel this policy at any time by notifying us ~~in writing~~ of the date cancellation is to take effect."  Thus, by using the second method, the insured may cancel the policy at "any time" by simply notifying State Farm "of the date cancellation is to take effect."  Then, to finalize this second method of insured-initiated cancellation, State Farm merely confirms the "date and time of cancellation" in writing.  The provision is both simple and unambiguous.

Although it does not appear Alabama courts have addressed cancellation language similar to the language in Davis's homeowners' policy, other courts have determined that where a policy provides for cancellation by the insured at "any time," the effective date of cancellation is the date requested by the insured.  Considering nearly identical policy language,[10] a Kansas appellate court

---

[10]  The cancellation policy language in *Benton* stated:

4. Cancellation

How You May Cancel. You may cancel your policy by notifying us in writing of the date to cancel, which must be later than the date you mail or deliver it to us. We may waive these requirements by confirming the date and time of cancellation to you in writing.

held that the insured's verbal request to cancel the policy was effective as of the date requested by the insured. *State Farm Mut. Auto. Ins. Co. v. Benton*, 113 P.3d 266, 269 (Kan. Ct. App. 2004). Specifically, that court explained "[r]egardless of what procedure State Farm had as its internal processing of the cancellation request, [the insured] conveyed his intention of cancelling the policy to agent Swinney and understood State Farm would cancel the coverage on the [subject vehicle] effective January 3, 2001, at 12:01 a.m." *Id.* Likewise, the Tenth Circuit has construed a policy permitting cancellation by the insured at "any time"[11] and stating "[i]f and when an insurance company receives an unequivocal request that a policy . . . be cancelled, the policy is effectively cancelled as of the date requested; neither the consent of or action by the insurer is necessary." *Comm. Standard Ins. Co. v. Farmers Alliance Mut. Ins. Co.*, 385 F.2d 826, 830 (10th Cir. 1967); *see also Allstate Ins. Co. v. Cipriani*, 629 So. 2d 183, 184 (Fla. Dist. Ct. App. 1993) (holding that even where the policy only provided for written cancellation, a call by the insured to his agent's office was sufficient to cancel the policy because "provisions permitting written cancellation generally are considered to be for the benefit of the insured"). Davis's attempts to distinguish *Benton* and *Cipriani* are unpersuasive. (Doc. 26 at 18-19). Davis is correct that the court in *Benton* held that the insurer did not have a duty to inform the plaintiff that her husband had canceled her vehicle insurance. 113 P.3d at 269. However, the *Benton* court also addressed the cancellation of the policy, *id.*, and the Kansas court's language regarding cancellation is instructive. As for

_____

113 P.3d at 268.

[11] The policy in *Commercial Standard* contained this provision:

This policy shall be cancelled at any time at the request of the insured, in which case this Company shall, upon demand and surrender of this policy, refund the excess of paid premium above the customary short rates for the expired time.

385 F.2d at 830 n.5.

*Cipriani*, Davis argues that there was no question of fact in that case as to whether the plaintiff contacted the insurance company to cancel her policy and points to the fact that the plaintiff had a history of contacting the insurance company to add and remove policies. (Doc. 26 at 19). While the facts in *Cipriani* are not identical to those in this case, its persuasive effect remains. The Florida appellate court relied on the conclusion that policy provisions providing that cancellation must be in writing are generally considered to be for the benefit of the insurer and thus subject to waiver by the insurer. *Cipriani*, 629 So. 2d at 184.

Furthermore, without an express provision stating otherwise, it would be illogical to allow an insurer's delay in providing written confirmation to effect or nullify the insured's cancellation. As the undisputed evidence demonstrates, Davis called State Farm on both November 29, 2013 and December 2, 2013, to stop her recurring monthly payment and expressed her intent to cancel the policy. This fulfilled the first part of the policy provision that the insured notify State Farm of when the cancellation is to take effect. State Farm then confirmed the date and time of the cancellation in writing to Davis on December 18, 2013, fulfilling the second part of the provision, that confirmation of cancellation be in writing. As Davis points out, (doc. 26 at 19), the policy does not provide a timeframe within which confirmation of cancellation must be made to the insured. State Farm did confirm the cancellation to Davis in writing within ten business days of her request.

The State Farm Payment Plan notice sent to Davis on December 9, 2013, (doc. 24-3 at 22), does not change or undo the cancellation. At the time an insured requests cancellation of a policy, that request "fixes the rights and liabilities of the parties as of the date of such request, and the fact that the insurer later wrote the insured declaring a subsequent date for cancellation does not operate to delay the cancellation." 2 COUCH ON INSUR. § 31:36 (citing *Atlantic Fire Ins. Co.*

*of Raleigh v. Smith*, 80 P.2d 216 (Okla. 1938)); *see also Commercial Standard*, 385 F.2d 831 (the insurer sending an inconsistent notice of cancellation after the insured's cancellation "do[es] not revivify the cancelled policy."). Moreover, Davis received the notice no earlier than December 9, 2013, *after* the December 7, 2013 fire loss, and thus could not have relied on the notice for any purpose. The rights and liabilities of the parties were fixed on November 29, 2013, then confirmed on December 2, 2013, and any subsequent action by State Farm, even if inconsistent, did not resurrect the policy or delay cancellation.

To survive a motion for summary judgment, there must be sufficient evidence from which a jury could reasonably find for Davis. *See Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). "A mere 'scintilla' of evidence will not suffice." *Id.* As outlined above, the evidence establishes that Davis asked, or at least agreed, for the homeowners' policy to be canceled, effective November 29, 2013, (doc. 24-11 at 19, doc. 24-9 at 23), and auto-drafts stopped because she did not have sufficient funds in her account, (doc. 24-11 at 20). The only evidence that could possibly be construed as being to the contrary is a single passage from her deposition in which she testifies that "it was my thinking and intention and understanding that if I didn't make a payment before the 10th that nothing was going to happen." (Doc. 24-2 at 30 (11:9-115:2)). This is no more than a "mere 'scintilla.'" Furthermore, in light of the undisputed evidence from the December 2, 2013 phone call in which Davis confirms her cancellation request, effective November 29, 2013, and her repeated failure to dispute that she requested to cancel her policy, no reasonable juror could conclude that Davis did not request cancellation. *See Scott v. Harris*, 550 U.S. 372, 379-80 (2007) (explaining that if the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no reasonable jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring jury determination).

Despite repeated arguments from Davis's counsel, there is simply no evidence to dispute the evidence establishing that Davis requested to cancel her homeowners' policy, effective November 29, 2013. State Farm is due summary judgment on the breach of contract claim.

## B. Bad Faith

Davis contends State Farm's bad faith refusal to pay and bad faith failure to investigate has caused her to suffer damages. (Doc. 24 at 23). The elements for the tort of bad faith are as follows: (1) an insurance contract between the parties and a breach thereof; (2) an intentional refusal to pay the insured's claim; (3) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason); (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason; and (e) if the intentional failure to determine the existence of a lawful basis if relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim. *National Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982); *see also State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 257-58 (Ala. 2013) (clarifying that there is only one tort for bad faith in Alabama, whether based on refusal to pay or refusal to investigate). To establish an insurer's bad faith, a plaintiff must go beyond a mere showing of non-payment and prove a bad faith non-payment, a non-payment without any reasonable grounds for dispute. *Bowen*, 417 So. 2d 179, 183 (Ala. 1982). The plaintiff must show the insurance company had no legal or factual defense to the insurance claim. *Id.*

"The plaintiff asserting a bad faith claim bears a heavy burden." *Shelter Mut. Ins. Co. v. Barton*, 822 So. 2d 1149, 1154 (Ala. 2001). "Bad faith . . . is not simply bad judgment or negligence. It imports a dishonest purpose and means breach of known duty, i.e., good faith and fair dealing, through some motive of self-invest or ill will." *Brechbill*, 144 So. 3d at 159-60. Here,

as explained above, there is no evidence a homeowners' insurance contract existed between the parties on the day of the loss to be breached. Without breach of contract, there can be no bad faith. *Id.* at 257-58.

Additionally, notwithstanding the absence of a contract, any bad faith claim under Alabama law requires a plaintiff to prove, among other things, the absence of any reasonably legitimate or arguable reason for an intentional refusal to pay the insured's claim, i.e., the absence of a debatable reason for the denial. *Id.* at 257. If the insurer's investigation "established a legitimate or arguable reason for refusing to pay," that is sufficient. *Id.* State Farm's investigations concluded the homeowners' policy was no longer in force on December 7, 2013, the date of loss. Davis cannot establish the elements required under *Brechbill*.

There is no dispute State Farm conducted two separate and thorough investigations of Davis' claim: one in December 2013/January 2014 and another in the summer of 2014. Both investigations showed that Davis called and requested cancellation of her policy on November 29, 2013. During the investigation, Davis <u>never</u> contended that she did not request policy cancellation (as her brief now alleges). Additionally, Davis points to no evidence that State Farm would have had the opportunity to evaluate during its investigation that would raise a question as to the substance of Davis's telephone calls to State Farm on November 29, 2013 and December 2, 2013. To the contrary, State Farm's investigation revealed Davis asked for the homeowners' policy to be canceled on November 29, 2013, (doc. 24-11 at 19, doc. 24-9 at 23), and auto-drafts stopped because she did not have sufficient funds in her account, (doc. 24-11 at 20). This was confirmed by a phone call to her agent's office three days later, on December 2, 2013. (*Id.*). A single email stating that "[c]laims is a little nervous about this one" from someone outside of the investigation, and without context, does not create a bad faith claim. Furthermore, Davis's arguments based on

State Farm's decision to satisfy the mortgage are misplaced. Travelstead clarified his testimony regarding payment of the mortgage within minutes; allowing Davis to use the unclarified testimony as a "gotcha" moment is not justified. Furthermore, Davis points to no evidence Justice knew Davis's policy was in a "non-renew" status for the following year or how that fact would influence his investigation. Finally, the impact of any communications with Davis *after* the loss and their impact on Davis, or when the denial letter was sent to Davis are irrelevant in assessing State Farm's investigation.

Because State Farm's investigation revealed the policy was no longer in force on the date of loss, there was a legitimate or arguable reason for refusing to pay. There are no genuine issues of material fact, and State Farm is entitled to summary judgment on Davis's bad faith claim.

## IV. Conclusion

There being no genuine issues of material fact, State Farm's motion for summary judgment is **GRANTED** as to Davis's breach of contract and bad faith claims, and this action will be **DISMISSED WITH PREJUDICE**. A separate order will be entered.

DONE this 13th day of September, 2017.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE